## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THOMAS BURNSIDE, | CASE NO. 3:13-cv-2554-MWB-GBC |
| Plaintiff, | (JUDGE BRANN) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S APPEAL |
| Defendant. | Docs. 1, 6, 7, 12, 16, 17 |

## REPORT AND RECOMMENDATION

### I.    Procedural Background

On August 11, 2010, Thomas Burnside ("Plaintiff") protectively filed an application as a claimant for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-34.[1]  (Administrative Transcript (Doc. 7), hereinafter, "Tr." at 128).  On January 3, 2011, Plaintiff's claim was denied at the

---

[1] Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes.  The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It is undisputed that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010.  (Tr. 147).

initial level of administrative review (Tr. 93, 102-106), and Plaintiff requested a hearing on February 17, 2011.  (Tr. 107-108).   On September 12, 2012, an administrative law judge ("ALJ") held a hearing at which Plaintiff, who was represented by an attorney, and a vocational expert appeared and testified.[2]  (Tr. 69-92).  On September 24, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits.  (Tr. 12-28).   On November 23, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 9-11), which the Appeals Council denied on August 29, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner.  (Tr. 1-6).

On October 13, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration denying social security benefits.  (Doc. 1).  On December 27, 2013, the Commissioner ("Defendant") filed an answer and an administrative transcript of proceedings.  (Docs. 6, 7).  On March 31, 2014, Plaintiff filed a brief in support of the appeal ("Pl. Brief") (Doc. 12).  On

---

[2] Plaintiff initially appeared for a hearing on June 12, 2012, but the hearing was continued so that he could obtain representation.  (Tr. 37-68).

April 30, 2014, the Court referred this case to the undersigned Magistrate Judge. On June 6, 2014, Defendant filed a brief in response ("Def. Brief") (Doc. 16). Plaintiff filed a brief in reply on June 16, 2014 ("Pl. Reply") (Doc. 17).

## II. Relevant Facts in the Record

Plaintiff was born on November 16, 1961, and thus was 37-years-old on the alleged disability onset date and 49 years old when he was last insured for benefits. (Tr. 75). He graduated from high school (Tr. 165), and previously worked as an industrial mechanic and a forklift operator (Tr. 86-87). On November 1, 1999, Plaintiff was injured in an car accident. (Tr. 185). Plaintiff alleges disability due to a combination of impairments including herniated cervical discs C4 and C5, severe/constant pain, numbness down the right arm, and depression. (Tr. 126-31, 164).

Following the auto accident in November 1999, Plaintiff sought treatment for a cervical spinal injury. *E.g.* (Tr. 179-217). Plaintiff earned an income above the substantial gainful activity levels between 1999 through 2005. (Tr. 17, 132-

46).[3]  Plaintiff stopped working in 2004, after the business where he worked closed and received a severance package.  (Tr. 75-76).  Following Plaintiff's layoff, Plaintiff received unemployment compensation benefits for two years.  (Tr. 76-77).  In 2006, Plaintiff earned an Associate's Degree in business from Luzerne County Community College.  (Tr. 77-78, 85).

The ALJ found that Plaintiff last met the insured requirements of the Act on December 31, 2010.  (Tr. 17).  Prior to the expiration of his insured status, Plaintiff lived in a home with his parents.  (Tr. 74, 153-54).  After his father died, Plaintiff cared for his mother until she was admitted into a skilled nursing facility in December 2010.  (Tr. 74, 315).  He maintained a driver's license and drove a few times per week.  (Tr. 78).  Plaintiff also cared for his personal needs independently; prepared simple meals; performed household chores every week; shopped in stores; and watched television.  (Tr. 154-57).

///

---

[3] Plaintiff does not dispute that he cannot be found disabled for the years when he was doing substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i).  It is from 2006 through December 31, 2010, (his date last insured) when Plaintiff no longer had posted earnings that exceeded the substantial gainful activity level.  (Tr. 134).

**A. Relevant Treatment History and Medical Opinions**

**1.  Gerald Gibbons, M.D., Treating Physician – Treatment Records,**

**February 3, 1982 to May 10, 2012**

Dr. Gerald Gibbons has treated Plaintiff from 1982 to 2012.  (Tr. 218-314, 341-343, 388-394).  In treatment records from 1982 and 1983, Plaintiff complained of low back pain.  (Tr. 238).  In a treatment record dated October 16, 1997, Plaintiff complained of neck pain that he has had on and off for about two years. (Tr. 234).  In a record dated August 18, 1998, Dr. Gibbons noted that Plaintiff had some chronic neck pain, particularly on the right side.  (Tr. 232).  The neck pain was resolved within two weeks.  (Tr. 224).

Following an automobile accident, in a treatment record dated December 7, 1999, Dr. Gibbons concluded that Plaintiff had a cervical strain and sprain.  (Tr. 231).  In a treatment record dated April 2, 2001, Dr. Gibbons noted that Plaintiff was "feeling well" and "no symptoms whatsoever."  (Tr. 229).  Dr. Gibbons discussed Plaintiff's failure to attend follow-up appointments, history of non-compliance regarding treating his ongoing hypertension, and the need to completely abstain from alcohol, to which, Plaintiff "laughed and just walked out

and said he couldn't do it." (Tr. 229). The record contains several notations indicating Plaintiff's no-shows for appointments with Dr. Gibbons: February 3, 1992 (Tr. 236); June 29, 1992 (Tr. 236); February 15, 1994 (Tr. 235); January 6, 2000 (Tr. 231); April 4, 2000 (Tr. 230); May 7, 2001 (Tr. 229); March 3, 2003 (Tr. 228); January 11, 2006 (Tr. 222); April 14, 2008 (Tr. 221).

In a treatment record dated October 29, 2002, Plaintiff inquired about Viagra and Dr. Gibbons replied that depending on the results of the blood tests, he would give some Viagra samples. (Tr. 228). On October 22, 2003, Plaintiff's mother asked for Plaintiff's prescriptions and Dr. Gibbons informed her that Plaintiff had not visited the doctor's office in over a year, that he needed to be seen, and that she was an enabler. (Tr. 227). In a treatment record dated December 16, 2003, Plaintiff reported that his neck continued to give problems on and off and Dr. Gibbons reiterated that without the necessary blood work, he could not prescribe more medication. (Tr. 226). Plaintiff inquired again about Viagra, to which Dr. Gibbons responded that he could not give it until Plaintiff underwent the necessary stress test. (Tr. 226).

In a treatment record dated August 2, 2004, Plaintiff reported continued discomfort in the right side of his neck and his shoulders. (Tr. 224). A letter dated August 16, 2005, informed Plaintiff that he was overdue for an appointment and that after lab work, they could renew his medication. (Tr. 223). In a treatment record dated September 7, 2005, Plaintiff reported continued neck and arm pain. (Tr. 222). Plaintiff stated that he no longer had medical insurance to cover physical therapy and Dr. Gibbons noted that a follow-up appointment would be in four months. (Tr. 222).

Over two years later, on January 12, 2008, Plaintiff returned to Dr. Gibbon's office to address his ongoing hypertension, and it was noted that Plaintiff still did not have insurance. (Tr. 221). In a treatment record dated May 1, 2009, Plaintiff reported that the over the counter pain medication was not effective and that he could not get any blood work done because he lacked insurance. (Tr. 220). Dr. Gibbons noted that he prescribed pain medication and noted that the staff saw Plaintiff on multiple occasions visiting his father in the hospital. (Tr. 220). Nearly two years later, Plaintiff returned and in a treatment record dated April 28, 2011, Plaintiff reported that his neck pain increased in severity and frequency, the pain

radiated to the dominant extremity, and it was noted that Plaintiff still was without health insurance.  (Tr. 342).   During the April 2011 visit, it was also noted that Plaintiff had been noncompliant with blood pressure medication for one year.  (Tr. 342).  In a treatment record dated May 20, 2011, Plaintiff's hypertension was well-controlled.   (Tr. 391).   In a treatment record dated January 9, 2012, Plaintiff reported that he has used Viagra with excellent results and it was noted that due to Plaintiff's lack of insurance, he had not gotten any blood work done.  (Tr. 392).  In a treatment record dated May 10, 2012, Plaintiff reported that he continued to experience severe neck and shoulder pain, particularly to the right side.  (Tr. 393). It was observed that Plaintiff had kept his hypertension under control with medication and that he still did not have insurance.  (Tr. 393).

## 2.  Gerald Gibbons, M.D., Treating Primary Care Physician – Letter to Attorney, September 8, 2004

In a September 2004 letter, Plaintiff's primary care physician, Dr. Gibbons summarizes Plaintiff's neck related medical history.  (Tr. 425).   Dr. Gibbons opined that Plaintiff may never be able to return to work, given the significant degree of pain associated with his neck condition.  (Tr. 426).

**3.  Albert Janerich, M.D. and Associates (With John Romanace, M.D.,**

**Severino Piczon, M.D., Elaine Lacey, PA-C, and Mark Lacey, PA-C) –**

**Clinic Notes from February 3, 2000 to March 27, 2007; 2011 and 2012**

Dr. Romanace, Dr. Janerich, Dr. Piczon, Ms. Lacey and Mr. Lacey, treated Plaintiff from February 2000 to March 2007, with a gap in treatment until 2011 and 2012.  (Tr. 179- 217).  In a treatment record dated February 3, 2000, Dr. Romanace noted that Plaintiff's visit was for continued follow-up regarding injuries sustained from a car accident that took place November 1, 1999.  (Tr. 185). In the February 2000 record, Dr. Romanace noted that the MRI of his neck revealed disc herniation at C4/5, limited range of motion in the neck, that Plaintiff complained of neck pain, wrist symptoms, and that different previous therapies and medications had not provided lasting relief.  (Tr. 185).  In the February 2000 record, Dr. Romanace suggested that Plaintiff be evaluated by a Dr. Hanlon for an epidural block.

On March 31, 2000, Dr. Janerich noted little improvement after an initial course of cervical epidurals with Dr. Hanlon, and that Plaintiff experienced spasm and reduced cervical range of motion.  (Tr. 186).  In the March 2000 record, Dr.

Romanace modified Plaintiff's physical therapy. (Tr. 186). On April 26, 2000, Dr. Janerich noted that conservative measures of care yielded little improvement, found Plaintiff to be improved to about ten percent of normal, and recommended a neurosurgical opinion from Dr. Carson Thompson. (Tr. 187). On June 26, 2000, it was reported that after consultation, Dr. Thompson did not believe that surgery was necessary to treat Plaintiff and the treating physician determined that Plaintiff could return to work with restrictions that were not specified in the record. (Tr. 188).

On June 25, 2000, Dr. Romanace noted that Plaintiff did not show any improvement following the third injection from Dr. Hanlon and noted that two surgical opinions from Dr. Nakkache and Dr. Thompson did not recommend surgery. (Tr. 189). Dr. Romanace continued Plaintiff's treatment of pain medication and physical therapy, noted that Plaintiff continued to experience pain, and is on light duty work. (Tr. 189). In an August 23, 2000, treatment record, it was noted that Plaintiff continued to suffer from chronic neck pain and has improved to twenty percent of normal. (Tr. 190). In the August 2000 record, it was also noted that Plaintiff still had a palpable spasm in the paracervical area, no

trigger points were identified, and Plaintiff was referred to Dr. Newhart to explore whether chiropractic treatment would help.  (Tr. 190).

In a treatment record dated September 24, 2001, Plaintiff complained of increased neck pain, denied numbness or paresthesias in the upper extremities, and reported using only Extra Strength Tylenol to address pain.  (Tr. 192).   In the September 2001 record, Dr. Romanace observed a decreased range of motion of the cervical spine, tenderness on palpation and tight muscles in Plaintiff's neck.  (Tr. 192).  In the September 2001 record, Dr. Romanace further observed normal range of motion in the upper extremities and ultimately concluded that it appeared Plaintiff had a flare up likely aggravated by his work.  (Tr. 192).  In the September 2001 record, Dr. Romanace recommended restarting physical therapy and prescribed pain medication.  (Tr. 192).

In a reported dated October 22, 2001, Plaintiff reported that physical therapy was working and that his pain decreased by ten percent.  (Tr. 193).  In the October 2001 report, Dr. Romanace observed decreased range of motion to the left, but normal range of motion on the right, that Plaintiff did not have any trigger points or muscle spasm, and upper extremities were normal.  (Tr. 193).  On November 1,

2000, Dr. Janerich noted that Plaintiff's condition remained twenty percent of normal, and that Plaintiff reported that in July he had tried returning to work in a transitionary program, however, that only lasted several weeks.  (Tr. 191).  On November 19, 2001, Dr. Romanace observed decreased range of motion in the cervical spine, scant spasm on palpation, and upper extremities were normal.  (Tr. 194).  In the November 19, 2001 report, Dr. Romanace recommended continued physical therapy, prescribed an additional medication and recommended trying epidural blocks again.  (Tr. 194).

In a record dated January 14, 2002, Dr. Romanace noted that Plaintiff continued physical therapy three times a week, which included traction, and Plaintiff reported that the neck pain had improved and that he could sleep fairly well at night.  (Tr. 195).  In the January 2002 record, Dr. Romance observed that Plaintiff had a normal range of motion in his cervical spine with only slight discomfort, no muscle spasm or trigger points, and recommended continued physical therapy.  (Tr. 195).

In a record dated March 19, 2002, Plaintiff reported continued physical therapy three times a week, continued neck pain, but continued improvement.  (Tr.

196).  In the March 2002 report, Dr. Romanace observed that Plaintiff has a good range of motion in his cervical spine with only slight discomfort, no neurological deficits, nor spasm, and no trigger points.  (Tr. 196).  Dr. Romanace advised that Plaintiff still had a herniated disc at C4/5 and should not do any heavy lifting, pushing, or pulling, nor should Plaintiff work with his arms overhead or do any crawling.  (Tr. 196).  In the March 2002 report, Dr. Romanace also advised that Plaintiff should refrain from frequent standing, walking, or frequently turn his head, since such activities could aggravate his symptoms.  (Tr. 196).  Dr. Romanace renewed a prescription for pain medication, recommended continuing with conservative management, and recommended follow-up with Plaintiff after he completed the physical therapy program.  (Tr. 196).

In a record dated July 3, 2002, Plaintiff reported going to physical therapy, that he has much less pain, and that his improvement was at sixty percent.  (Tr. 197).  In the July 2002 record, Dr. Romanace observed that Plaintiff had normal flexion and normal rotation of his cervical spine both left and right, while extension caused him some discomfort.  (Tr. 197).  Dr. Romance also reported that Plaintiff's condition was generally improving.  (Tr. 197).  In a record dated

October 4, 2002, Dr. Piczon summarized the July 2002 report as Plaintiff doing much better and demonstrating no hard clinical findings. (Tr. 198). In the October 2002 report, Plaintiff reported significant improvement, with no cervical muscle pain or any focal tenderness or restricted movement in his range of motion. (Tr. 198). In the October 2002 report, Dr. Piczon stated that Plaintive had shown "90 to 95% improvement," recommended to discontinue prescription pain medication and instead use over the counter pain medication, and to continue physical therapy in addition to home exercises. (Tr. 198). Dr. Piczon also noted that upon the next follow up examination, they could explore the possibility of Plaintiff's return to full regular duties. (Tr. 198). In a record dated November 8, 2002, Dr. Piczon found that Plaintiff improved, with no significant pain, tenderness or any muscle spasm and that Plaintiff exhibited a full range of motion. (Tr. 199). Dr. Piczon recommended for Plaintiff to continue with the home exercise program, to use of Tylenol, as needed, and found Plaintiff rehabilitated enough to be discharged, only to return for treatment if symptoms returned. (Tr. 199).

After nearly a year, on October 9, 2003, Plaintiff returned for treatment due to an exacerbation of his neck pain. (Tr. 200). In the October 2003 record, Dr.

Piczon noted that Plaintiff had returned to work as an industrial mechanic for a while, but the work of that position was too heavy and he had done better once he switched to instrumentation repair work.  (Tr. 200).   During the October 2003 examination, Dr. Piczon did not find any "hard clinical findings," noting that Plaintiff had a supple range of movement in the neck without pain, no motor or sensory signs and no significant muscle spasm or trigger points.  (Tr. 200).   In response to the October 2003 examination findings, Dr. Piczon recommended maintaining the home exercise program, the use of over the counter pain medication, moist heat, and to continue regular work duty as before.  (Tr. 200).

Five months later, Plaintiff returned for treatment on March 10, 2004.  (Tr. 201).   In the March 2004 record, Plaintiff reported changing jobs to a forklift operator and the required frequent turning of his head aggravated his neck pain. (Tr. 201).   During the March 2004 examination, Dr. Romanace observed that Plaintiff had a supple range of motion in the neck without significant muscle spasm or trigger points and resumed prescription pain medication.  (Tr. 201).   On April 5, 2004, Plaintiff had an emergent visit, seeking treatment for neck pain, which he asserted was twenty percent of normal.  (Tr. 202).

During the April 2004 visit, Plaintiff reported that the new forklift operating job aggravated his neck pain, resulting in him being off work for the previous ten days. (Tr. 202). Plaintiff requested for a note to remain off of work until his neck pain improved. (Tr. 202). Plaintiff also reported he was unable to regain his previous position due to layoffs and the fact that the job was reserved for more senior employees. (Tr. 202). Dr. Janerich's certified physician assistant, Elaine Lacey, observed that Plaintiff could go from sitting to standing and standing to siting independently, had some guarding and decreased range of motion of the cervical spine, and had tenderness over the right paracervical region, without any significant tenderness over the right trapezius or right shoulder area. (Tr. 202). Ms. Lacey recommended getting a new MRI of the cervical spine to compare to the previous one taken on December 1, 1999. (Tr. 202). Ms. Lacey further recommended discontinuing over the counter pain medication, starting new prescription medication, and to restart physical therapy. (Tr. 202-203).

In a treatment record dated May 10, 2004, Plaintiff reported that the prescription medication was effective and Dr. Romanace observed a decreased range of motion of the cervical spine, mild tenderness on palpation over the

paracervical region, and no muscle spasm or trigger points. (Tr. 204). In a treatment record dated August 11, 2004, Dr. Janerich found Plaintiff to have improved to seventy percent of normal, observing palpable spasm and limitation of motion especially with extension. (Tr. 205). In the August 2004 record, Dr. Janerich recommended for Plaintiff to wear a neck brace, continue medications, and to not work. (Tr. 205). In November 16, 2004, Dr. Janerich noted that Plaintiff's neck pain varied from two to four on a scale of zero to ten, and noted a persistent spasm and a reduction in cervical mobility. (Tr. 206).

In a record dated April 12, 2005, Ms. Lacey noted that Plaintiff's insurance did not cover the sleeping neck brace. (Tr. 207). Plaintiff reported that he could not pay for the neck brace on his own, and since his last visit in November 2004; he had lost his health insurance and could not afford the prescription pain medication. (Tr. 207). Plaintiff reported that he was at twenty percent of normal. (Tr. 207). During the April 2005 examination, Ms. Lacey observed no acute distress, a decreased range of motion in the cervical spine, with some guarding and tenderness. (Tr. 207). In the April 2005 record, Plaintiff reported collecting unemployment benefits while taking college business courses "so that he can

hopefully take a job in a less physical field." (Tr. 207).

In a record dated October 10, 2005, Plaintiff reported a lack of overall change in his condition and that he was fifty percent of normal. (Tr. 208). In the October 2005 report, Dr. Janerich's certified physician assistant, Mark Lacey, stated that Plaintiff had a "history of ML strain cervical spine with cervical disc disease." (Tr. 208). In a treatment record dated February 28, 2006, Plaintiff reported increase severity in pain, and upon examination; Dr. Romanace observed a functional range of motion in his cervical spine and tenderness over the paracervical area. (Tr. 209). Dr. Romanace concluded that Plaintiff was fairly stable and would follow up in six months. (Tr. 209).

In a treatment record dated July 31, 2006, Ms. Lacey noted that Plaintiff was still fifty percent of normal and had no significant changes since the last visit. (Tr. 210). Ms. Lacey reported that Plaintiff was still uninsured which "very much limits" the treatment options that they could provide him. (Tr. 210). During the July 2006 visit, Plaintiff stated that he recently finished college and hoped to find a job that was not as laborious as his former job, so that he could return to working. (Tr. 210). Ms. Lacey encouraged Plaintiff to avoid activities that aggravated his

pain and advised him that his taking ten to twelve Tylenol pills a day was too high. (Tr. 210).  Plaintiff stated that he had a routine visit scheduled with his primary care provider, Dr. Gibbons, however, due to his financial issues, he may not be able to follow up with any liver function studies.  (Tr. 210).  Ms. Lacey observed that Plaintiff was able to go from sitting to standing and standing to siting independently, continued to have some restriction in the range of motion in his neck, no significant tenderness on palpation, some mild paracervical spasm, and no radiation of pain to the upper extremities.  (Tr. 210).

Eight months later, in a treatment record dated March 14, 2007, Dr. Janerich noted that a recent EMG and Nerve Conduction study completed by Dr. Emanuel Jacobs revealed no evidence of radiculopathy.  (Tr. 212).  Dr. Janerich noted that Plaintiff was having increasing numbness of the arm and weakness. (Tr. 212).  Dr. Janerich did not state whether a recent MRI was conducted (it appears from the record that there exists only the December 1999 MRI (Tr. 396, 411)), however, noted that Plaintiff's MRI of his neck showed no surgical disease, and showed that Plaintiff had a shallow midline herniated disc at C4/5.  (Tr. 212).  Dr. Janerich also observed that Plaintiff had a spasm with restricted motion.  (Tr. 212).  In a

treatment record dated March 27, 2007, Dr. Janerich noted that an additional EMG and Nerve Conduction Study conducted that day demonstrated evidence in keeping with a right C6 radiculopathy and Dr. Janerich would correlate the test when he was able to personally examine Plaintiff in a following visit.  (Tr. 213-217).

Four years later, on May 5, 2011, Plaintiff returned for treatment.  (Tr. 408). Ms. Lacey reported that Plaintiff had a documented discogenic disease of the neck and cervical radiculopathy.  (Tr. 408).  Ms. Lacey reported that although they had received a note from Plaintiff's primary care physician, Dr. Gibbons, that Plaintiff was abusing alcohol and the treatment plan was to have him evaluated by Clear Brook for his follow-up visit, Plaintiff did not show up until four years later for the May 2011 visit.  (Tr. 408).  Ms. Lacey observed that Plaintiff could go from sitting to standing and standing to sitting independently, had some restricted range of motion in the cervical spine, and some paracervical tenderness mainly on the right. (Tr. 408).  Ms. Lacey also observed that Plaintiff experienced some intermittent radicular symptoms to the right arm.   (Tr. 408).   During the May 2011 visit, Plaintiff stated that he has not had any alcohol for three years.  (Tr. 408).  Plaintiff also stated that he still had the transcutaneous electrical nerve stimulation

Page **20** of **51**

("TENS") unit at home, however, 'forgot' about it and had not used it lately to alleviate his symptoms.  (Tr. 408).  Ms. Lacey noted that because Plaintiff was still "self-pay," that would limit their ability to do any diagnostic tests or send Plaintiff for further treatment.  (Tr. 408).

In a treatment record dated July 7, 2011, Dr. Janerich stated that Plaintiff still experienced neck pain which related to degenerative arthritis with a right C6 radiculopathy.  (Tr. 408).  Dr. Janerich observed that Plaintiff had a spasm, no trigger points and had a continued reduced range of motion.  (Tr. 409).  Although during the July 2011 appointment Dr. Janerich recommended a follow-up evaluation in six to eight weeks, Plaintiff returned a year later on July 12, 2012. (Tr. 410).  During the July 2012 visit, Plaintiff reported that he could not afford the pain medication since he was self-pay.  (Tr. 410).  Plaintiff reported that his neck pain remained at ten to twenty percent of normal; he had not worked in years, was running out of financial means and was attempting to apply for disability.  (Tr. 410).  Ms. Lacey noted that Plaintiff continued to experience a restricted range of motion of the cervical spine, tenderness over the right paracervical region and the right trapezius area, no significant spasm, and no trigger points.  (Tr. 410).

**4.  Albert Janerich, M.D., Treating Physician, Letters to Attorney from August 10, 2004; June 20, 2005; and September 4, 2012**

In letters dated August 10, 2004; June 20, 2005; and September 4, 2012, Dr. Janerich summarized the years of clinical treatment, Plaintiff symptoms, and clinical findings.   (Tr. 395-407).   In the September 2004, June 2005, and September 2012 letters, Dr. Janerich described Plaintiff's condition as a "musculoligamentous strain" to the cervical spine with "myofascitis" (Tr. 395, 399, 402), and a "cervical disc herniation at C4/5 with epidural sac impingement" as documented on an MRI done December 1, 1999, and interpreted by Dr. Joel Schwartz, Radiologist for Valley Open MRI.   (Tr. 395, 402).   Dr. Janerich explained the progressive deteriorating nature of spinal injuries (Tr. 402-403), and that although as of 2004 Plaintiff was not a surgical candidate, "if his condition progresses, as it very well might since trauma accelerates the degenerative process, he may go on at some future date to require surgery."  (Tr. 402-403).   In the August 2004 letter, Dr. Janerich stated:

> Individuals with chronic pain suffer three behavioral concomitants, those being anxiety, depression and over attentiveness on bodily functions, bordering on hypochondriasis.

> I would therefore respectfully disagree with Dr. Prebola wherein he indicates on page 6 of his IME report dated November 26, 2003, that there was "obvious symptom magnification tendencies with today's evaluation".
>
> It is my opinion that the "symptom magnification tendencies" revealed to Dr. Prebola rather represent over attentiveness on bodily functioning which is a regrettable, though natural, consequence of chronic pain.

(Tr. 404).    Dr. Janerich further stated that contrary to Dr. Prebola's conclusions, the resulting pain and degree of disability supports a finding disc herniation at C4/5 with dural sac impingement.  (Tr. 404).  In the June 2005 and September 2012 letters, Dr. Janerich stated that Plaintiff should avoid lifting, carrying, pushing or pulling loads in excess of five pounds with the right arm or ten pounds with the left arm, or using his upper extremities at or above shoulder height, or any repetitive use of his upper extremities.  (Tr. 396, 406).  Dr. Janerich elaborated that his assessment of Plaintiff's limitations apply to activities of daily living and are not meant to suggest that Plaintiff is capable of working within the enumerated restrictions and opined that Plaintiff "is completely and totally disabled from

gainful employment as a result of his discogenic disease of the cervicothoracic spine with neurologic involvement . . . ." (Tr. 396).

### 5.  V. Benjamin Nakkache, M.D., F.A.C.S., F.I.C.S. – Consultative Examination, February 4, 2000

In the February 2000 consultative examination report, neurosurgeon, Dr. Nakkache, opined that the MRI findings were of "minimal if any clinical relevance whatsoever" and that it was more likely that Plaintiff suffered from facet pain syndrome combined with myofasical pain syndrome.  (Tr. 421).  Dr. Nakkache concluded that he would not recommend any type of surgery for Plaintiff unless a more definitive finding is seen on a repeat MRI.  (Tr. 421).

### 6.  William Prebola, M.D. – Independent Medical Evaluation, November 26, 2003

In the November 2003 medical evaluation report, Dr. Prebola summarized findings from diagnostic tests, all were unremarkable.  (Tr. 423).  Upon comparison of a June 1995 x-ray and the December 1999 MRI, Dr. Prebola stated that he could not find any evidence of disc herniation and that the C4-5 disc did not cause any neural foraminal stenosis.  (Tr. 423).

### 7.  Joseph Campanella, M.D. – Consultative Examination, December 16, 2010

At an examination with consultative examiner Dr. Campanella, on December 16, 2010, Plaintiff complained of neck pain, right shoulder pain, and occasional numbness in his right hand.  (Tr. 313).  He stated that he lived alone (his mother had recently been admitted to a nursing facility), cared for his personal hygiene needs independently, and managed 100 percent of the household chores and personal hygiene.  (Tr. 315).  On examination, Plaintiff did not exhibit limitations with ambulation, posture, or with ability transfer from a chair to the examination table.  (Tr. 314).  Plaintiff was able to accomplish a hand writing sample without limitation, reported that he had no problem with sitting, and was unaware of any limitations to standing or ambulation because since he did not engage in any activities requiring these functions.  (Tr. 315).  However, Plaintiff reported that fear of aggravating his neck condition caused him to limit his activities in general.  (Tr. 315).

Plaintiff indicated that he slept approximately twelve hours per day (cumulative), watched television ten to twelve hours per day and drove a car three

to four times per week.  (Tr. 315).  Dr. Campanella noted that Plaintiff exhibited equal upper extremity strength, and normal range of motion in all planes, except for lateral flexion of his cervical spine, which was 20 out of 40 degrees on the right side.   (Tr. 316, 319-20).   Dr. Campanella opined that Plaintiff's physical examination provided minimal support for his chronic neck pain complaints and no support for Plaintiff's right shoulder pain or right hand numbness.  (Tr. 316).  Dr. Campanella observed no limitations in Plaintiff's ability to stand, walk, sit, lift, carry, push or pull (Tr. 317), but opined that Plaintiff should limit exposure to heights, moving machinery, vibration, temperature extremes, wetness, pulmonary irritants, and humidity.  (Tr. 318).

### III.    Legal Standards and Review of ALJ Decision

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A).  A claimant for disability benefits must show that he or she has a

physical or mental impairment of such a severity that:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. 20 C.F.R. § 404.1520; *accord Plummer*, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. 20 C.F.R. § 404.1520(a)(4). The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. 20 C.F.R. §§ 404.1520, 416.920. Before

moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof.  The claimant bears the burden of proof at steps one through four.  *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Id.*  The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff.  *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

When reviewing the Commissioner's decision denying a claim for disability benefits, the Court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence.  *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008).  Substantial evidence is a deferential standard of review.  *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 564 (1988) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Substantial evidence requires only 'more than a mere scintilla' of evidence, *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)), and may be less than a preponderance.  *Jones*, 364 F.3d at 503.  If a reasonable mind might accept the relevant evidence as adequate to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence.  *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Johnson*, 529 F.3d at 200.

## A. Whether Substantial Evidence Supports the ALJ's Finding at Step Two of the Sequential Evaluation Process

The ALJ determined that Plaintiff had "the following severe impairments: degenerative disc disease (hereinafter DDD), ML strain and cervical strain." (Tr. 18).  Plaintiff contends that that the ALJ's failure to define "ML strain" and failure to characterize Plaintiff's impairment as a "disc herniation at C4/5" amounts to reversible error.  (Pl. Brief at 4-5).

### 1. "ML Strain"

Ultimately, Plaintiff concedes "that the term 'ML strain,' as used by the physician's assistant, probably was 'musculoligamentous strain.'" (Pl. Reply at 8). However, Plaintiff still argues that when the ALJ used the term "ML strain," there is no way to "know if the ALJ knew that ML strain was musculoligamentous strain." (Pl. Reply at 8). This contention is without merit.

The Court notes that in addition to the October 2005 report, wherein Dr. Janerich's certified physician's assistant, Mark Lacey, stated that Plaintiff had a "history of ML strain cervical spine with cervical disc disease" (Tr. 208), the entire record shows that only two different "strain" characterizations of Plaintiff's cervical spine condition exist.  (Tr. 208, 231, 395, 399, 402).  Of the "strain" characterizations, one was in a treatment record dated December 7, 1999, where Dr. Gibbons concluded that Plaintiff had a cervical strain and sprain (Tr. 231), and in the September 2004, June 2005, and September 2012 letters, Dr. Janerich described Plaintiff's condition as a "musculoligamentous strain" (Tr. 395, 399, 402).

Plaintiff does not dispute that he had a severe, medically determinable,

impairment of his cervical spine.  Moreover, the ALJ's decision is clear that she considered all of the medical records, and understood that the Plaintiff suffered from a cervical spine impairment, and, in fact, the ALJ used the very terminology ("ML strain") that was in the medical evidence submitted by Plaintiff in a treatment record from Plaintiff's treating spine injury specialist.  Based on the foregoing, the Court concludes that from the context of the medical records and the ALJ's decision, the ALJ understood "ML strain" to mean "musculoligamentous strain" of the cervical spine.

## 2.  Failure to Characterize Plaintiff's Severe Impairment as a "disc herniation at C4/5"

The ALJ extensively reviewed the records and indicated what portions of the record mentioned a "disc herniation at C4/5."  (Tr. 19-21, 23).  Specifically, the ALJ noted that in "December of 1999, an MRI of his cervical spine noted a herniated disc at C4-5 and DDD . . . per Dr. Janerich. Although Dr. Prebola reviewed this MRI and does not find a herniated disc, but describes it as disc protrusion with no stenosis."  (Tr. 21).  The ALJ further noted that Dr. Gibbons' treatment notes referenced an MRI showing a herniation at C4-5, but the vast

majority of visits noted all normal objective findings.  (Tr. 23).   Additionally, in the February 2000 consultative examination report, neurosurgeon, Dr. Nakkache, opined that the MRI findings were of "minimal if any clinical relevance whatsoever."  (Tr. 421).   Despite recommendations in February 2000 and April 2004 to obtain a more recent MRI to ascertain Plaintiff's condition and to verify if Plaintiff, in fact, had a "disc herniation at C4/5" (Tr. 202, 421), such had not occurred.

During the period where Plaintiff was not engaged in substantial gainful activity, there is one treatment record from March 2007, wherein Dr. Janerich stated that Plaintiff's 1999 MRI showed that Plaintiff had a shallow midline herniated disc at C4/5.  (Tr. 212).   In a September 2012 letter to Plaintiff's attorney, Dr. Janerich described Plaintiff as having a "cervical disc herniation at C4/5 with epidural sac impingement," as documented on an MRI done December 1, 1999 and interpreted by Dr. Joel Schwartz, Radiologist for Valley Open MRI. (Tr. 395, 402).   In a June 2005 letter to Plaintiff's attorney, Dr. Janerich further stated that, contrary to Dr. Prebola's conclusions, the resulting pain and degree of disability supported finding a disc herniation at C4/5.  (Tr. 404).   Implicit in Dr.

Janerich's opinions is the conclusion that the disc herniation determined from a 1999 MRI, still exists through December 31, 2010, based on Plaintiff's continued symptoms.

Given the conflicting MRI interpretations (from experts such as radiologist, Dr. Schwartz; neurosurgeon, Dr. Nakkache; treating spinal injury physician Dr. Janerich; and independent medical evaluator, Dr. Prebola) regarding whether a cervical disc herniation at C4/5 existed, the ALJ did not err in deciding not to characterize Plaintiff's cervical spine impairment explicitly as "disc herniation at C4/5."

Even assuming *arguendo* that the ALJ erred, the Court would still find harmless error.  Ultimately, the outcome of the case depends on the demonstration of the functional limitations of the disease or impairment rather than the mere diagnosis of the disease or name of the impairment.  *See Alexander v. Shalala*, 927 F. Supp. 785, 792 (D.N.J. 1995) *aff'd sub nom. Alexander v. Comm'r of Soc. Sec.*, 85 F.3d 611 (3d Cir. 1996); accord, *Walker v. Barnhart*, 172 F. App'x 423, 426 (3d Cir. 2006).  Where the ALJ finds that Plaintiff suffers from even one severe impairment, any failure on the ALJ's part to identify other conditions as severe or

precisely name the severe impairment does not undermine the entire analysis, when ultimately the ALJ properly characterized the symptoms and functional limitations. *See e.g.*, *Lambert v. Astrue*, No. Civ.A. 08–657, 2009 WL 425603, at *13 (W.D. Pa. Feb. 19, 2009); *Alexander v. Shalala*, 927 F. Supp. 785, 792 (D.N.J. 1995) *aff'd sub nom. Alexander v. Comm'r of Soc. Sec.*, 85 F.3d 611 (3d Cir. 1996); *Faircloth v. Colvin*, No. Civ.A.12–1824, 2013 WL 3354546, at *11 (W.D.Pa.2013), *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n. 2 (3d Cir. 2007); *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("any error here became harmless when the ALJ reached the proper conclusion that [Plaintiff] could not be denied benefits conclusively at step two and proceeded to the next step"); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) ("[T]he ALJ considered any limitations posed by the [impairment] at Step 4 . . . any error that the ALJ made in failing to include the [impairment] at Step 2 was harmless"); *Moriggi v. Astrue*, No. 1:11-CV-11-MP-GRJ, 2012 WL 555732, at *6 (N.D. Fla. Jan. 13, 2012) *report and recommendation adopted*, No. 1:11CV11-MP-GRJ, 2012 WL 555703 (N.D. Fla. Feb. 21, 2012) ("Although the ALJ did not include the specific medical diagnosis of 'L5–S1 disk herniation with nerve stenosis and impingement damage,'

the ALJ, nonetheless, went on to evaluate at step four of the sequential evaluation Plaintiff's functional limitations, including pain, resulting from Plaintiff's alleged impairments in his lumbar spine.").

The Court notes that the ALJ's opinion considered all impairments of record and detailed the limitations resulting from the impairments at subsequent steps. Regardless of the characterization of Plaintiff's cervical spine condition, the ALJ's determination of Plaintiff's RFC acknowledged Plaintiff's symptoms and functional impairments that resulted from Plaintiff's cervical spine condition. (Tr. 18-19). The ALJ noted medical records and Plaintiff's testimony regarding symptoms of neck pain, range of motion in the cervical spine, spasms, pain radiating to the upper extremities, side effects from medications, daily activities, duration of being able to sit, stand, and walk. (Tr. 19-22). Based on the foregoing, the ALJ's failure to characterize Plaintiff's impairment as a "disc herniation at C4/5" does not require a remand.

## B. Credibility Determination of Plaintiff

Plaintiff contends that the ALJ erred by: (1) failing to take account of Plaintiff's lack of medical insurance in considering his intermittent treatment as a

factor in the credibility determination; (2) basing the credibility determination, in part, on the fact that Plaintiff had a prescription for Viagra but denied having a girlfriend; and (3) basing the credibility determination, in part, on the fact that Plaintiff received unemployment compensation for a period of time, when he was claiming disability. (Pl. Brief at 3-4, 8-12).[4]

Great weight is given to a claimant's subjective testimony only when it is supported by competent medical evidence. *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979); accord *Snedeker v. Comm'r of Soc. Sec.*, 244 F. App'x 470, 474 (3d Cir. 2007). An ALJ may reject a claimant's subjective testimony that is not found credible so long as there is an explanation for the rejection of the testimony. SSR 96-7p; *Schaudeck v. Comm'r of Social Security*, 181 F.3d 429, 433 (3d Cir. 1999). Where an ALJ finds that there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is

---

[4] It appears that in his reply brief, Plaintiff is arguing for the extension of the "cumulative error doctrine" to apply in the review of administrative decisions. (Pl. Reply at 4). The Court notes that the Third Circuit has not extended the "cumulative error doctrine" to civil trials, let alone to review of administrative decisions. *See U.S.S.E.C. v. Infinity Group Co.*, 212 F.3d 180, 196 (3d Cir. 2000).

not substantiated by objective medical evidence, the ALJ must make a finding on

the credibility of the individual's statements based on a consideration of the entire

case record.   SSR 96-7p.   In determining a claimant's credibility regarding the

severity of symptoms, the ALJ must consider the following factors in totality: (1)

the extent of daily activities; (2) the location, duration, frequency, and intensity of

pain or other symptoms; (3) precipitating and aggravating factors; (4) the type,

dosage, effectiveness, and side effects of any medication; (5) treatment other than

medication for the symptoms; (6) measures used to relieve pain or other

symptoms; and (7) other factors concerning functional limitations and restrictions

due to pain or other symptoms.   SSR 96-7p; 20 C.F.R. §§ 404.1529, 416.929;

accord *Canales v. Barnhart*, 308 F. Supp. 2d 523, 527 (E.D. Pa. 2004).

An ALJ may treat a claimant's noncompliance with a treatment plan as a

factor in analyzing the credibility of the claimant's testimony.   *Smith v. Astrue*, 961

F. Supp. 2d 620, 654 (D. Del. 2013).   Furthermore, Social Security Ruling ("SSR")

96-7p, states that:

> the individual's statements may be less credible if the level or
> frequency of treatment is inconsistent with the level of complaints, or

if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure. However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

SSR 96-7p.

### 1. Intermittent Treatment

In the decision dated September 24, 2012, the ALJ made several observations regarding Plaintiff's intermittent treatment and failure to comply with treatment recommendations. (Tr. 19-21). The ALJ noted that "Dr. Gerald Gibbons treated the claimant from 1982 to 2012 with large gaps between treatments." (Tr. 19). The ALJ noted that "[i]n April of 2001 . . . [when] Dr. Gibbons recommended abstinence from alcohol; the claimant just laughed and stated he 'could not do it.'" (Tr. 19). After a September 2005 visit, the ALJ noted that "there was a gap in treatment until January of 2008." (Tr. 19). After a May 2009 visit, the ALJ noted that Plaintiff "had another gap in treatment with Dr. Gibbons with the next visit in April of 2011 . . . ." (Tr. 20). The ALJ also noted that Plaintiff "treated with Dr. John Romanace M.D., Dr. Severino Piczon M.D.

and Dr. Albert Janerich M.D. from 2000 into 2007 with a gap in treatment until 2011 and 2012." (Tr. 20). The ALJ observed that Plaintiff "did not treat again with Dr. Janerich from March of 2007 until May of 2011." (Tr. 20). The ALJ noted that after the July 2011 visit, Plaintiff "had another gap in treatment until July of 2012." Tr. 20. Finally, the ALJ noted that Plaintiff:

> received a $250,000 settlement from his automobile accident case in 2007; this also coincides with a large gap in treatment with Dr. Janerich that went on from March of 2007 until early 2011, coincidentally when his Title II claim was initially denied. [Plaintiff] also visited with Dr. Gibbons once in 2008 and once on 2009 with a gap in treatment until 2011. Surely, these large time gaps in treatment are inconsistent with debilitating physical conditions.

(Tr. 21).

An ALJ may reject a claimant's subjective testimony that is not found credible so long as there is an explanation for the rejection of the testimony. SSR 96-7p, *Schaudeck v. Comm'r of Social Security*, 181 F.3d 429, 433 (3d Cir. 1999). Specifically, Social Security Ruling ("SSR") 96-7p, requires that:

> the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, *or other information in the case*

*record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.*

SSR 96-7p (emphasis added).

Indeed, in *Newell v. Comm'r of Soc. Sec.*, the Third Circuit observed "that several courts have questioned the relevance of infrequent medical visits in determining when or whether a claimant is disabled." 347 F.3d 541, 547 (3d Cir. 2003). Specifically, SSR 96-7 illustrates that where the "individual may be *unable to afford treatment and may not have access to free or low-cost medical services*," such may contradict a negative credibility finding based on the infrequency of treatment. SSR 96-7 (emphasis added). The example provided in SSR 96-7 is premised on *both* an inability to afford treatment and lack of access to free or low-cost medical services. SSR 96-7.[5]

---

[5] Other cases suggest that ability to afford treatment is the predominant factor. *See Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 543, 547 (finding ALJ erred where claimant's explanation for failure to seek treatment was that she could not afford treatment and "the record demonstrate[d] that her income during the germane period was very low and that she did not have medical insurance, circumstances that support her claim that she could not afford treatment."); *see also Maskevich v. Astrue*, No. CIV.A. 07-5841 (JAP), 2009 WL 2356846, at *11 (D.N.J. July 30, 2009) (finding substantial evidence supported ALJ's determination that a claimant's complaint of not being able to afford necessary medical care was not credible where claimant maintained four cats and three large dogs which must have been a significant cost, received a salary before she claimed she became disabled, unemployment insurance benefits

While Plaintiff argues that the ALJ failed to consider Plaintiff's lack of medical insurance, Plaintiff does not assert an inability to afford treatment during the claim period and the ALJ explicitly stated that Plaintiff's four year treatment gap with Dr. Janerich for his cervical spine injury coincides with Plaintiff's receipt of a $250,000 settlement from his automobile accident case in 2007, only for Plaintiff's treatment to resume once his Title II claim was initially denied.  (Tr. 21).  Moreover, not only are there gaps in treatment when Plaintiff was insured, the ALJ did comply with SSR 96-7p by considering "other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment," namely, the gap in treatment preceding the receipt of $250,000 and resuming after an initial attempt to obtain Title II benefits had failed.  *See* SSR 96-7p; (Tr. 21).

The ALJ noted that during the time that Dr. Gibbons treated Plaintiff from 1982 to 2012, there were large gaps between treatments.  (Tr. 19).  The ALJ noted

---

after she claimed she became disabled, and child support payments); *Rotunno v. Massanari*, 17 F. App'x 926, 929 (10th Cir. 2001) (finding no error where ALJ used the lack of medical treatment as evidence that alleged impairments were not as serious as he contended where claimant asserted an inability to afford medical treatment yet received a $60,000 settlement cash payment).

times where Plaintiff was insured and Plaintiff demonstrated a refusal to follow treatment advice, as evident from the April 2001 visit (Tr. 19, 229), wherein Dr. Gibbons discussed Plaintiff's failure to attend follow-up appointments, history of non-compliance regarding treating his ongoing hypertension, and the need to completely abstain from alcohol.  The record further shows that when Plaintiff was insured, he failed to comply with requisite blood tests in order to get refills for pain prescriptions.  (Tr. 226-227).  For example, on October 22, 2003, in response to Plaintiff's mother's request for pain medication on her son's behalf, Dr. Gibbons informed Plaintiff's mother that Plaintiff had not seen him in over a year, that Plaintiff needed to be seen, and that she was an enabler.  (Tr. 227).  Then again, in December 2003, Plaintiff reported that his neck continued to give problems on and off and Dr. Gibbons reiterated that without the necessary blood work, he could not prescribe more medication.   (Tr. 226).   The record contains several notations indicating Plaintiff's no-shows for appointments with Dr. Gibbons when he had insurance coverage and after he lost the coverage: January 6, 2000 (Tr. 231); April 4, 2000 (Tr. 230); May 7, 2001 (Tr. 229); March 3, 2003 (Tr. 228); January 11, 2006 (Tr. 222); April 14, 2008 (Tr. 221).

In sum, it was not error for the ALJ to not explicitly state whether Plaintiff's lack of health insurance was the reason for failure to comply with treatment recommendations and the infrequency of treatment, where: (1) failure to comply with treatment requirements and the infrequency of treatment existed when Plaintiff *did* have health insurance; (2) where the ALJ considered "other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment" pursuant to SSR 96-7p; and (3) the record does not show that Plaintiff was unable to afford medical treatment. *See* SSR 96-7; *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 543, 547.

## 2. Receipt of Unemployment Benefits

In the September 2012 decision, the ALJ stated that the claimant's receipt of unemployment compensation in 2004 and 2005:

> raises an admission that the claimant verified to the State of Pennsylvania that [he] was ready willing and able to work. This is clearly inconsistent with his claim for disability that he is incapable if sustaining any form of work since the alleged onset date of 1999. As was stated above, the claimant earned above SGA income levels through 2005.

(Tr. 22).  Plaintiff contends that it was error for the ALJ to not consider testimony that Plaintiff did not certify that he could work and his receipt of unemployment compensation was through a NAFTA retraining program.  (Pl. Brief at 12 (citing Tr. 77)).[6]  Without citing to any law, Plaintiff' attorney states that "[p]resumably, he did not have to certify that he could work, since he was in the NAFTA retraining program."  (Pl. Brief at 12).[7]

The Third Circuit has yet to address whether the receipt of unemployment benefits can adversely affect a social security claimant's credibility.[8]  Other circuits have found that continued receipt of unemployment benefits can cast doubt

---

[6] *See Hampe v. Butler*, 364 F.3d 90, 91 (3d Cir. 2004) (describing the unemployment benefits provided under the Trade Act of 1974, 19 U.S.C. § 2291-98).

[7] The Court notes that 19 U.S.C.A. § 2291(c)(1)(A) states that a health waiver from training requirements "shall not be construed to exempt a worker from requirements relating to the availability for work, active search for work, or refusal to accept work under Federal or State unemployment compensation laws" and 19 U.S.C.A. § 2294(a)(2) indicates that states unemployment insurance law applies regarding eligibility.

[8] In support of his argument, Plaintiff submits a 2006 memorandum from Social Security Administration Chief ALJ Frank A. Cristaudo.  The 2006 memorandum is unpersuasive authority.  The 2006 memorandum cites to 20 C.F.R. §§ 404.1512(b) and 416.912(b) which discuss the definition of "evidence" and examples of evidence without any specific mention to the relevance of a claimant receiving unemployment insurance.  Then the 2006 memorandum cites to SSR 00-01C, 2000 WL 38896 (S.S.A. Jan. 7, 2000), which is simply an excerpt from *Cleveland v. Policy Management Systems Corp*, 526 US 795 (1999), addressing the interplay between Social Security Disability Insurance benefits, and the Americans with Disabilities Act (ADA) and not once mentioning unemployment insurance benefits.

on a claim of disability, as it shows that an applicant holds himself or herself out as capable of working.  *E.g.*, *Ghanim v. Colvin*, 763 F.3d 1154, 1165 (9th Cir. 2014), *accord Schmidt v. Barnhart,* 395 F.3d 737, 745–46 (7th Cir. 2005) (recognizing receipt of unemployment benefits could impact a claimant's disability claim); *Grable v. Colvin*, 770 F.3d 1196, 1202 (8th Cir. 2014) (citing to *Barrett v. Shalala,* 38 F.3d 1019, 1023 (8th Cir. 1994)) (finding that claimant's collection of unemployment benefits during the period of her claimed disability reinforced the ALJ's adverse credibility finding).  However, receipt of unemployment benefits does not necessarily contradict a claimant's assertion of inability to work. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161-62 (9th Cir. 2008) (finding where the record did not establish whether claimant held himself out as available for full-time or part-time work, being available for part-time work was not inconsistent with disability allegations); *Smith v. Colvin*, 756 F.3d 621, 625 (8th Cir. 2014) (noting that applying for unemployment benefits adversely affects credibility is not conclusive).  In *Cox v. Apfel*, the Eight Circuit summarized:

> We have held that the acceptance of unemployment benefits, which entails an assertion of the ability to work, is facially inconsistent with a claim of disability.   However, the negative impact cannot be

uniformly or automatically applied in every case. Where, as here, there is no other evidence to detract from the claimant's credibility, the negative inference is not sufficient, of itself, to negate the claimant's credibility.

160 F.3d 1203, 1208 (8th Cir. 1998) (internal citations omitted).  The Court finds the above authority from the Seventh, Eighth and Ninth Circuits persuasive in concluding that receipt of unemployment benefits can adversely impact a social security benefit claimant's credibility, however, the negative impact cannot be uniformly or automatically applied in every case.  *E.g.*, *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161-62; *Cox v. Apfel*, 160 F.3d 1203, 1208.

The Court finds that the ALJ erred in assuming that Plaintiff's receipt of unemployment benefits automatically "raises an admission that the claimant verified to the State of Pennsylvania that [he] was ready, willing and able to work" (Tr. 22).  *See e.g.*, *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161-62; *Cox v. Apfel*, 160 F.3d 1203, 1208.  However, this error is harmless since substantial evidence in the record supports that Plaintiff indicated that he was "willing and able to work."  In fact, the ALJ specifically stated that contrary to Plaintiff's assertion of disability onset in 1999, claimant earned above SGA

income levels through 2005.  (Tr. 22).  Moreover, in an April 2005 treatment record, Plaintiff reported that he was taking college business courses "so that he can hopefully take a job in a less physical field."  (Tr. 207).  Although Plaintiff testified that once he obtained his degree he did not attempt to find work because he could not function anymore (Tr. 84), during the July 2006 medical visit, Plaintiff stated that he recently finished college and hoped to find a job that was not as laborious as his former job, so that he could return to working.  (Tr. 210).

### 3.  Viagra Use when Not in Relationship

In the September 2012 decision the ALJ found that:

> The claimant's subjective complaints and limitations regarding pain and functionality are beyond what the objective evidence of record indicates. This undermines the claimant's credibility. Dr. Prebola in 2003 noted the claimant had symptom magnification tendencies and had been working lifting upwards of eighty to one hundred pounds. The claimant testified that he could only sit for ten to twelve minutes, yet during the CE in December of 2010, he reported to Dr. [Campanella] he had no problems sitting or standing. Dr. [Campanella] also reported the claimant as no problems with personal hygiene, driving, walking and fine manipulation with his dominant right hand. The claimant testified that he does not have a girlfriend or significant other yet repeatedly requested Dr. Gibbons for Viagra. In January of 2012, Dr. Gibbons reported the claimant has been using Viagra with "excellent results."

(TR 22).   Plaintiff argues that "Viagra is a medication used for erectile dysfunction.   What a man does with the consequent erection obtained by its use may reflect upon his morals but not his credibility. There was no basis in logic for the conclusion that the plaintiff was less credible because he obtained a prescription for Viagra and did not have a girlfriend."  (Pl. Brief at 10).

The Court finds that it was error for the ALJ to make an adverse credibility finding based on an assumption that lacking a sexual partner contradicts "using Viagra with 'excellent results.'"  *See Kinney v. Astrue*, No. 3:11-CV-1848, 2013 WL 877164, at *18 (M.D. Pa. Mar. 8, 2013) (finding error where the ALJ's credibility judgment was based on a faulty premise).   However, the above described error is harmless and does not affect the outcome of the case.  *See Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005).   The ALJ's Viagra observation was considered in addition to the enumerated SSR 96-7 credibility factors in totality.   In this totality analysis, not any single factor is dispositive and the ALJ considered many additional factors in determining Plaintiff's credibility regarding the severity of the symptoms.   The ALJ also observed that "Dr. Prebola in 2003 noted the claimant had symptom magnification tendencies and had been

working lifting upwards of eighty to one hundred pounds." (Tr. 22). The ALJ further observed the extent of daily activities, various reports of the frequency and intensity of cervical spine pain and radiation to the upper extremities, flare-ups and activities that aggravate the pain, medication, history of treatment which Plaintiff's treating physicians characterized as "conservative" (Tr. 187, 196), and a specialist's opinion that Plaintiff did not require surgery (Tr. 188-189, 421). (Tr. 18-23). Given the abovementioned facts and analysis, substantial evidence supports the ALJ's credibility determination of Plaintiff.

## IV.    Recommendation

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of

evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. *Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate.

Accordingly, it is HEREBY RECOMMENDED:

I.      This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and

II.     The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall

apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: December 9, 2014            _____s/Gerald B. Cohn_____
                                        GERALD B. COHN
                                 UNITED STATES MAGISTRATE JUDGE